No. 25-1555 (and consolidated cases)

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

ATLAS DATA PRIVACY CORP., AS ASSIGNEE OF INDIVIDUALS WHO ARE COVERED PERSONS; JANE DOE 1, A LAW ENFORCEMENT OFFICER; JANE DOE 2, A LAW ENFORCEMENT OFFICER; EDWIN MALDONADO; SCOTT MALONEY; JUSTYNA MALONEY; PATRICK COLLIGAN; PETER ANDREYEV; AND WILLIAM SULLIVAN,
*Plaintiffs-Appellees,*

v.

WE INFORM LLC, ET AL.,
*Defendants-Appellants.*

On Appeal from the Judgment of the United States
District Court for the District of New Jersey
(Dist. Ct. No. 24-cv-4037)

## BRIEF OF *AMICI CURIAE* STATE OF OHIO, 40 OTHER STATES, AND THE DISTRICT OF COLUMBIA SUPPORTING APPELLEES

DAVE YOST
Ohio Attorney General

T. ELLIOT GAISER*
Ohio Solicitor General
 *Counsel of Record
ZACHERY P. KELLER
Deputy Solicitor General
30 E. Broad St., 17th Fl.
Columbus, Ohio 43215
614.466.8980
thomas.gaiser@ohioago.gov

*Counsel for Amicus Curiae
State of Ohio*

*Additional counsel listed after signature block*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION AND STATEMENT OF *AMICI* INTEREST ....................... 1

SUMMARY OF ARGUMENT .............................................................. 3

ARGUMENT ..................................................................................... 5

    I.     Protecting public servants is vital to effective government. .................... 6

        A.    Public officials have always faced dangers, but those dangers have increased in recent years. ................................................... 6

        B.    Threats and violence directed at public servants lower the quality of our government ............................................................... 11

    II.    The Court should reject calls for strict scrutiny. ................................. 13

        A.    Protecting public servants is a vital part of the States' sovereignty.... 15

        B.    Strict scrutiny would unduly restrain the States' ability to devise solutions to new security threats. ....................................... 17

CONCLUSION.................................................................................. 20

ADDITIONAL COUNSEL ................................................................... 21

CERTIFICATE OF COMPLIANCE ....................................................... 23

CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEF ......................... 24

CERTIFICATE OF VIRUS SCAN.......................................................... 25

CERTIFICATE OF COUNSEL ............................................................. 26

CERTIFICATE OF SERVICE............................................................... 27

i

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n,*
576 U.S. 787 (2015) ..................................................................... 2, 5, 17

*Blatchford v. Native Village of Noatak,*
501 U.S. 775 (1991) ...................................................................... 2, 16

*Bond v. United States,*
572 U.S. 844 (2014) .......................................................................... 16

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011) .......................................................................... 19

*Carpenter v. United States,*
585 U.S. 296 (2018) ..........................................................................20

*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,*
447 U.S. 557 (1980) .......................................................................... 15

*Davenport v. Wash. Educ. Ass'n,*
551 U.S. 177 (2007) ....................................................................... 3, 14

*Florida Star v. B.J.F.,*
491 U.S. 524 (1989) .................................................................. 2, 13, 14

*Kyllo v. United States,*
533 U.S. 27 (2001) ............................................................................ 19

*McCullen v. Coakley,*
573 U.S. 464 (2014) .......................................................................... 19

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) .......................................................................... 14

*In re Neagle,*
135 U.S. 1 (1890) .......................................................................*passim*

*New State Ice Co. v. Liebmann,*
285 U.S. 262 (1932) .......................................................................... 17

*Northwest Airlines, Inc. v. Minnesota*,
322 U. S. 292 (1944) ....................................................................20

*United States v. Lopez*,
514 U.S. 549 (1995) ..................................................................... 17

*Vieth v. Jubelirer*,
541 U.S. 267 (2004) ..................................................................... 19

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015) ..................................................................... 12

## Statutes and Constitutional Provisions

U.S. Const. amend. X ...................................................................... 16

705 Ill. Comp. Stat. §90/1-1 .......................................................... 18

705 Ill. Comp. Stat. §90/2-5 .......................................................... 18

705 Ill. Comp. Stat. §90/3-1 .......................................................... 18

Ariz. Stat. Rev. Ann. §11-483 ....................................................... 18

Cal. Gov. Code §6254.21 ............................................................... 18

Col. Rev. Stat. §18-9-313.5 ........................................................... 18

N.J. Stat. Ann. §56:8–166.1 ............................................................ 1

Nev. Rev. Stat. §293.908 ............................................................... 18

Ohio Rev. Code §149.43 ................................................................ 18

Okla. Stat. §21-1176 ...................................................................... 18

Or. Rev. Stat. §247.965 ................................................................. 18

Tex. Gov. Code §552.117 .............................................................. 18

Wash. Rev. Code §4.24.680 ........................................................... 18

## Other Authorities

2024 Year End Report on the Federal Judiciary ..........................................2, 10, 12

Dan Trevas, *Video of Judge Shooting Must Be Released By Jefferson County*, Court News Ohio (Nov. 24, 2020) ........................................................8

David K. Li & Mirna Alsharif, *David DePape, man who attacked Paul Pelosi with a hammer, sentenced to 30 years in prison*, NBC News (May 17, 2024) .......................................................................................... 11, 12

Gowri Ramachandran, et al., *Intimidation of State and Local Officeholders*, Brennan Center for Justice (Jan. 25, 2024)..........................*passim*

Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* 210 (2018) ............................................. 17

*Judges Targeted Fast Facts*, CNN (last updated April 15, 2025) .....................7, 8, 11

*Judicial Security Legislation Stalls, Awaits Congressional Action in 2021*, U.S. Courts (Dec. 17, 2020) .......................................................... 7, 10

Letter from State Attorneys General to Lindsey Graham, et al. (Dec. 14, 2020)..................................................................................... 18

Lisa Ryckman, *States and Congress Act to Protect Judicial and Election Workers*, NCSL (Aug. 16, 2023) ....................................................1, 19

Madalyn Mendoza, *Forty years ago, U.S. District Judge Wood assassinated in San Antonio by Woody Harrelson's father*, San Antonio News (May 19, 2019) ...........................................................7

Pete Simi, et al., *Rising Threats to Public Officials: A Review of 10 Years of Federal Data*, CTC Sentinel (May 2024) ........................................9

*Press Release: Local Elected Officials Report Increase in Harassment in Lead-Up to Election*, Princeton University Bridging Divides Initiative (Nov. 22, 2024) .......................................................................9

Pub. L. No. 117-263, §5931..............................................................................18

Pub. L. No. 117-263, §5933..............................................................................18

iv

Pub. L. No. 117-263, §5934 ....................................................................... 18

Scott MacFarlane & Melissa Quinn, *Nicholas Roske, man accused of trying to kill Brett Kavanaugh, intends to plead guilty, court documents show*, CBS News (April 2, 2025) ..................................................... 7, 8

William H. Rehnquist, *Judicial Independence*, 38 U. Rich. L. Rev. 579 (2004) ....................................................................................................... 12

## INTRODUCTION AND STATEMENT OF *AMICI* INTEREST

"There isn't a day that I don't realize my job cost me the life of my only child." District Judge Esther Salas spoke those words to state lawmakers a few years after an unhinged lawyer showed up at her home and murdered her son, Daniel Anderl. Lisa Ryckman, *States and Congress Act to Protect Judicial and Election Workers*, NCSL (Aug. 16, 2023), https://tinyurl.com/3e44x4u8. Judge Salas's tragic loss offers one extreme example of violence against public servants. There have been many others in our Nation's history. But while public service has always carried certain risks, the dangers have greatly increased in recent years. Today, there is nothing unusual about threats and attacks directed at government officials. Public servants—of all parties, in all branches, at all levels of government—face those dangers every day.

Technology stokes the fire. In modern times, personal information about public officials is often only a few clicks aways. Thus, with minimal thought or effort, disgruntled individuals can easily gain access to the homes and lives of whichever public officials draw their ire. To reduce these modern dangers, Congress and state legislatures have enacted laws to better protect the personal information of public officials. This case, for instance, involves "Daniel's Law," a New Jersey statute that prohibits the unconsented disclosure of a public official's home address and unpublished telephone number. N.J. Stat. Ann. §56:8–166.1. Many support such

common-sense legislation.  Just last year, Chief Justice Roberts expressed his gratitude "to the many federal and state legislators who have stepped forward to sponsor bills shielding judges' personal identifying information from the public domain."  2024 Year End Report on the Federal Judiciary, at 6, https://perma.cc/GZV2-D8XX ("2024 Year End Report").

Despite that gratitude, this case asks whether the Constitution allows the States to enact such legislation.  The answer is "yes, it does."   The Supreme Court has long recognized that protecting public servants is a critical aspect of sovereignty.  *In re Neagle*, 135 U.S. 1, 59, 64 (1890).  Because the States are sovereigns in their own right, *see Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779 (1991), they share that responsibility in our federalist system.  Indeed, our constitutional structure expects the States to act "as laboratories" of democracy, "devising solutions" to new and difficult problems.  *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015).  Coming up with ways to better protect public servants in the digital age fits that description to a T.

The First Amendment does not prohibit the States from acting on their sovereign duty.  Rather, it leaves room for States to safeguard people's privacy when important interests are at stake but no speech of public significance is at risk.  *See Florida Star v. B.J.F.*, 491 U.S. 524, 536–37 (1989).  Here, the States' interests in protecting their

public servants could not be more compelling. In stark contrast, the limited information on the line (public servant's home addresses and personal phone numbers) is of little public significance, at least in the usual case. Said another way, restricting the disclosure of such limited personal identifying information does nothing to "raise[] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *See Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188 (2007) (quotation omitted). Because the risk of viewpoint discrimination "is inconsequential" in these situations, *see id.*, the States retain the sovereign power to protect their state and local officials from personal dangers in the digital age.

For these reasons, the *amici* States are interested in this case. They urge the Court to uphold Daniel's Law and to reject the defendants' call for strict scrutiny.

## SUMMARY OF ARGUMENT

I. Public servants have always run the risk that disgruntled citizens might lash out against them physically. Over the years, many government officials have lost their lives—or the lives of their loved ones—because of violence related to their public service. Often, these tragedies happen at the official's personal home. And the dangers of unwanted and violent home visits have only increased with advancing technology. With modern practices such as "doxing"—whereby critics maliciously post personal information online to try and incite harassment—it has become much easier

3

for unstable individuals to gain access to the personal lives of whichever public officials they happen to despise.

Violence against public officials threatens government at all branches and levels. And it also threatens the long-term quality of government. After all, even the best government officials will be less likely to do what they deem right if they are worried about violent retaliation against their families. Many good people are already leaving public service to avoid dangers to themselves and their families. And many that remain in public service are cutting back on their engagement with constituents, so as to reduce the risks of threats and violence. None of this improves our government.

**II.** To protect public servants in the digital age, Congress and many States have recently enacted laws prohibiting the disclosure of officials' personal information. The defendants say that such laws must survive strict scrutiny under the First Amendment. They are wrong for many reasons. The *amici* States emphasize two of those reasons, both of which flow from first principles of our constitutional order.

*First*, sovereignty necessarily entails responsibility to protect public servants. Our Constitution, the Supreme Court said long ago, does not leave government officials "unprotected" against attacks resulting from "the conscientious discharge of" their duties. *In re Neagle*, 135 U.S. at 59. The States, as sovereigns in our federalist system, also retain the power to protect their officials. It would thus be quite

radical to say that the First Amendment presumptively strips the States of their ability to perform this sovereign function under the circumstances of this case.

*Second*, our federalist system expects that States will act as laboratories for applying old principles to new problems that the founding generation could not have predicted. *See Ariz. State Legis.*, 576 U.S. at 817. Modern security problems such as doxing fall comfortably within that mold. The defendants' call for strict scrutiny, it follows, should give this Court considerable pause. That demanding standard would necessarily limit the States' ability to devise creative solutions in this new area.

## ARGUMENT

When private citizens enter public service, they expose themselves and their families to increased risks of violence. The States, as responsible sovereigns, must protect their officials from such dangers. In entering the Union, the States did not surrender the ability to protect their officials against newly emerging dangers. The First Amendment says nothing to the contrary.

Through this brief, the *amici* States give shape to the threats that public officials face today. They then explain why our original constitutional structure cuts strongly against applying strict scrutiny to laws such as Daniel's Law.

## I.   Protecting public servants is vital to effective government.

The Court cannot fully appreciate the lives at stake in the abstract.  Historical and recent examples help illustrate the dangers that government officials face because of their public service.

### A.   Public officials have always faced dangers, but those dangers have increased in recent years.

Public servants have long confronted dangers associated with the discharge of their duties.  A few tragedies involving public servants, such as presidential assassinations, no doubt come immediately to mind.  Others are less well known.

To provide some historical perspective, start with an incident from 1889.  That year, a deadly encounter occurred between David S. Terry and Justice Stephen Johnson Field.  *See generally In re Neagle*, 135 U.S. 1.  Justice Field made an enemy out of Terry while serving on the Ninth Circuit (as a circuit rider for the Supreme Court).  Specifically, Justice Field ruled against Terry's wife in an inheritance dispute involving her alleged marriage to another man.  *In re Neagle*, 135 U.S. at 44–45.  Terry's wife believed that Justice Field "had been bought," so she threatened to kill him.  *Id.* at 45–46.  Terry shared that belief.  And he eventually acted on his wife's threat, attacking Justice Field in a train car.  *Id.* at 52–53.  Terry struck the Justice with repeated blows.  *Id.*  And, amidst those blows, it appeared to the U.S. Marshall

(Neagle) that Terry was drawing a knife. *Id.* at 53. In response, Neagle shot Terry twice and killed him. *Id.*

Judges have continued to face violence since then. Over the last 50 years, four federal judges have been murdered. *Judicial Security Legislation Stalls, Awaits Congressional Action in 2021*, U.S. Courts (Dec. 17, 2020), https://perma.cc/7VMD-VMHP ("*Judicial Security Legislation Stalls*"); *see Judges Targeted Fast Facts*, CNN (last updated April 15, 2025), https://perma.cc/D57V-DXFG ("*Judges Targeted Fast Facts*"). In 1979, a rifle shot killed District Judge John H. Wood Jr. while he was leaving his Texas home for work. Madalyn Mendoza, *Forty years ago, U.S. District Judge Wood assassinated in San Antonio by Woody Harrelson's father*, San Antonio News (May 19, 2019), https://tinyurl.com/5yv4phhc. A decade later, District Judge Richard Daronco was shot and killed at his New York home by a man upset over a court ruling. *Judges Targeted Fast Facts*. The next year, a mail bomb took the life of Eleventh Circuit Judge Robert Vance at his Alabama home. *Id.*

Justice Kavanaugh was more recently a target. A man dressed in black—armed with a gun, knife, zip-ties, and burglary tools—was caught outside the Justice's home in the middle of the night. Scott MacFarlane & Melissa Quinn, *Nicholas Roske, man accused of trying to kill Brett Kavanaugh, intends to plead guilty, court documents show*, CBS News (April 2, 2025), https://perma.cc/2GVS-XEMB. The man admitted

that he was there to kill a "specific United States Supreme Court justice." *Id.* (quoting a court filing).

State court judges also face violence because of their service. A few years ago, a shooter ambushed an Ohio trial judge—Joseph J. Bruzzese Jr.—outside of a county courthouse. Dan Trevas, *Video of Judge Shooting Must Be Released By Jefferson County*, Court News Ohio (Nov. 24, 2020), https://tinyurl.com/544f4jfx. Luckily, Judge Bruzzese—who returned gunfire in response to the attack—survived the shooting. *Id.* Other state judges, however, have not been so fortunate. Three years ago, a Wisconsin judge, John Roemer, was murdered in his home by a man he had previously sentenced. *Judges Targeted Fast Facts*. Two years ago, a Washington judge, Andrew Wilkinson, was fatally shot in his driveway by a disgruntled child-custody litigant. *Id.* And last year, a Kentucky judge, Kevin Mullins, was killed in his chambers. *Id.*

People serving in other branches of government likewise encounter violence. Consider, for example, state lawmakers. As part of a recent survey, over 40 percent of the responding state lawmakers reported threats of harm to themselves or their loved ones. Gowri Ramachandran, et al., *Intimidation of State and Local Officeholders*, Brennan Center for Justice, at 7 (Jan. 25, 2024) ("*Intimidation of State and Local Officeholders*"), https://tinyurl.com/4be52hm6. One surveyed lawmaker recounted

how threateners had identified her home address and made known their intent to rape her. *Id.* at 14. Another described how critics had used photos of her home to threaten her children. *Id.*

And things do not always stop at threats: four percent of the state lawmakers surveyed reported being the victims of physical attacks. *Id.* at 7.

Survey responses from local officeholders were alarming, too. More than 18 percent of local officeholders reported experiencing threats or attacks within the last year and a half. *Id.* at 3. Local election officials have reported threats and harassment in comparable numbers. *See Press Release: Local Elected Officials Report Increase in Harassment in Lead-Up to Election*, Princeton University Bridging Divides Initiative (Nov. 22, 2024), https://perma.cc/GF52-YB2S.

And threats to public servants are on the rise. A 2024 study—reviewing federal charges against individuals for making threats against public officials—concluded that threats "began to spike in 2017 corresponding with a general increase in polarization," with "gradual, steady increases" since then. Pete Simi, et al., *Rising Threats to Public Officials: A Review of 10 Years of Federal Data*, CTC Sentinel (May 2024), https://perma.cc/PTD2-G2Y8. The study further noted that the number of federal prosecutions for threats against public servants is currently on pace to reach record highs. *Id.* at 20. Statistics from the U.S. Marshals paint a similar picture. *See*

*Judicial Security Legislation Stalls.*  In 2015, the Marshalls reported 926 "threats and inappropriate communications" targeting federal judges.  *Id.*  By 2021, that number was up to 4,449.  *Id.*; *see also* 2024 Year End Report at 5 (noting that "there has been a significant uptick in identified threats at all levels of the judiciary").  Along similar lines, many state lawmakers reported that the threat climate has gotten worse over their time in office.  *See Intimidation of State and Local Officeholders* at 8.

Modern-day technology often facilitates and promotes further intimidation. Chief Justice Roberts noted this concern within his most recent year-end report about the judiciary.   He observed that disappointed litigants often "rage at judicial decisions on the Internet, urging readers to send a message to the judge."  2024 Year End Report at 6.  More troubling, some "critics deploy 'doxing'—the practice of releasing otherwise private information such as addresses and phone numbers."  *Id.* Doxing, the Chief Justice went on, often leads "to a flood of angry, profane phone calls to the judge's office or home."  *Id.*  Worse still, doxing sometimes "prompt[s] visits to the judge's home, whether by a group of protestors or, worse, an unstable individual carrying a cache of weapons."  *Id.* at 7.  Again, these problems do not stop with the judiciary.  Several state lawmakers recently "reported that people who had targeted them with abuse knew and even publicized their home addresses or facts about their children."  *Intimidation of State and Local Officeholders* at 22.

All too often, families get caught in the crossfires of this violence. Daniel's Law serves as one painful reminder, but there are others. In 1999, an L.A. County Court Commissioner (H. George Taylor) and his wife were murdered at their homes. *Judges Targeted Fast Facts*. In 2005, a losing plaintiff murdered the husband and mother of District Judge Joan Humphrey Lefkow at the family's home. *Id.* More recently, a deranged individual attacked the husband of former House Speaker Nanci Pelosi with a hammer in their home. David K. Li & Mirna Alsharif, *David DePape, man who attacked Paul Pelosi with a hammer, sentenced to 30 years in prison*, NBC News (May 17, 2024), https://tinyurl.com/2f9smf6a. These examples reinforce that when citizens choose to serve the public, they expose their families to serious risks.

## B. Threats and violence directed at public servants lower the quality of our government.

Public servants and their families obviously suffer from this violence most directly and most severely. But violence against government officials also does lasting damage to the effectiveness of the American form of republican self-government. That government provides its essential public goods through coordinate branches that depend on the honest services of men and women of character, who will seek and hold legislative, executive, and judicial offices.

Consider, for instance, the harm of violence or threats to judicial independence. "Judicial independence is one of the touchstones of our constitutional system of

government." William H. Rehnquist, *Judicial Independence*, 38 U. Rich. L. Rev. 579, 579 (2004). To function properly, the judiciary must not become "subservient to" the opinions of others. *Id.* at 596; *accord Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 457 (2015). But judges will be far less likely to act independently if they fear reprisal in the form of violence against themselves or their families. *See* 2024 Year End Report at 5. Or, to borrow Alexander Hamilton's words, for "the power of judging" to remain independent, "all possible care is requisite to enable it to defend itself against … attack." Federalist No. 78.

Violence against public officials takes its toll in other ways, too. Recent surveys showed that many local and state officeholders are less willing to continue their public service due to the abuse they have experienced. *Intimidation of State and Local Officeholders* at 16. As one state senator poignantly questioned, "Is it worth me putting my family at risk because I vote a certain way, I espouse certain ideals?" *Id.* Many election officials have also left their positions in recent years. *Id.* That turnover puts election administration—including administration of presidential elections—in the hands of less experienced people. *Id.*

Even for those public servants who remain in office, there are more subtle consequences for the quality of government services. To illustrate, 39 percent of local officeholders and 21 percent of state legislators reported "that they are less willing

to advocate for contentious policies due to abuse." *Id.* One state lawmaker, who held moderate views, emphasized that threats "come[] from every direction" on controversial topics. *Id.* Another explained that she stopped proposing hot-button legislation because "my kids were too little, the threats were too common and too on point." *Id.* at 19. Many state and local officials also tried to limit their exposure to abuse by cutting back on public interactions with their constituents. *Id.* That approach, by its very nature, reduces citizens' access to their officeholders and diminishes the democratic accountability that representative government assumes.

The bottom line is simple. Democratic self-government depends on wise statesmen willing to serve. Violence against public servants reduces the number of people willing to serve; and it often reduces the quality of service from those who remain.

## II.   The Court should reject calls for strict scrutiny.

Of course, if the First Amendment truly prohibited the States from acting to protect their officials, that would be the cost of entry into the Union. But the First Amendment does no such thing. As everyone seems to agree, protecting public servants is "a state interest of the highest order." *See Florida Star*, 491 U.S. at 537 (quotation omitted). And, at least in most applications, the personal identifying information of public servants—such as their home addresses and cell-phone numbers— is of no "public significance." *See id.* at 536 (quotation omitted). Given that lopsided

13

comparison, laws like Daniel's Law will readily survive review under nearly any conceivable First Amendment standard.

Perhaps recognizing as much, the defendants in this case push for strict scrutiny. As New Jersey and the plaintiffs aptly explain, that is the wrong standard. *See* Atlas Br.14–15; N.J. Br.14. For starters, the Supreme Court has already developed a standard for evaluating laws that involve the clash between speech rights "and state-protected privacy interests." *Florida Star*, 491 U.S. at 530; *see id.* at 536–37, 540. The Court has intentionally kept that standard "less sweeping" than strict scrutiny. *See id.* at 533. And even assuming that laws like Daniel's Law are properly dubbed "content-based," not all content-based laws receive strict scrutiny under the First Amendment. *Davenport*, 551 U.S. at 188. Instead, "strict scrutiny is unwarranted" when a law does not "raise[] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Id.* Here, it is hard to imagine how limiting the publication of modest pieces of personal identifying information will drive any ideas out of the marketplace. Remember, also, that the defendants bring a facial challenge against Daniel's law. Such challenges evaluate "a law's full set of applications." *Moody v. NetChoice, LLC*, 603 U.S. 707, 718 (2024). That matters here because many potential applications of Daniel's law—such as selling government officials' personal information—will at most involve commercial speech,

which is subject to a lower standard of constitutional review. *See Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 561–63 (1980).

Beyond those points, the *amici* States emphasize two more. *First*, in entering the Union, the States retained the bulk of their sovereignty. And protecting public servants is an inherent part of that sovereignty. *Second*, in our federalist system, the States are supposed to act as laboratories of democracy, devising solutions to apply enduring principles to new and complicated problems. Subjecting this law and others like it to strict scrutiny would inhibit the States from experimenting with different ways to protect their government officials from dangers that modern technology exacerbates.

## A.    Protecting public servants is a vital part of the States' sovereignty.

Return to *In re Neagle*. *Above* 6–7 (recounting the case's facts). The legal question in that case was whether the U.S. Marshall who killed Terry was immune from state prosecution. The Supreme Court said that the Marshall was immune because he was acting under federal law. *In re Neagle*, 135 U.S. at 76. The Court, however, did not point to any federal statute empowering the Marshall to do what he did. *Id.* at 63. The Court instead reasoned that protection of judges was implicit in the faithful execution of the law. *Id.* It "would be a great reproach to the system of government of the United States," the Court explained, "if there is to be found within the

domain of its powers no means of protecting the judges, in the conscientious and faithful discharge of their duties, from the malice and hatred of those upon whom their judgments may operate unfavorably." *Id.* at 59. The Court further elaborated that it would be "very insufficient" if the Constitution "left the high officers of the government so defenceless and unprotected." *Id.* The Court thus concluded that the federal government's power to afford its judges sufficient "protection" was "implied by the nature of the government under the Constitution." *Id.* at 64.

The same implication empowers the States. When the States entered the Union, they did so "with their sovereignty intact." *Blatchford*, 501 U.S. at 779. Under the Tenth Amendment, the States retained those powers they did not expressly surrender to the federal government. *See* U.S. Const. amend. X. Thus, if protecting public servants is a necessarily implied aspect of effective sovereignty, then the States possess that power. *See In re Neagle*, 135 U.S. at 59, 64. And the States' retained powers also include a "police power," the "broad authority to enact legislation for the public good." *Bond v. United States*, 572 U.S. 844, 854 (2014). When federal law relieves the States of their traditional powers, it typically does so through clear statements that leave little doubt. *Id.* at 857–58. Adding up these foundational principles, it would be quite surprising—to say the least—if the First Amendment subtly stripped

16

the States of the ability to protect their public officials from newly emerging security problems in the digital age.

## B. Strict scrutiny would unduly restrain the States' ability to devise solutions to new security threats.

Another aspect of our federalist system bolsters that last point. A key benefit of divided sovereignty is that the States may "devise various solutions" to problems "where the best solution is far from clear." *Ariz. State Legis.*, 576 U.S. at 817 (quoting *United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring)); *cf.* Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* 210 (2018). As Justice Brandeis once put it, one of the "happy incidents of the federal system" is that even "a single courageous State may" attempt a novel solution to a problem "without risk to the rest of country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). Permitting space for state lawmaking in new areas does many good things: it "allows local policies more sensitive to the diverse needs of a heterogeneous society"; it "permits innovation and experimentation"; it "enables greater citizen involvement in democratic processes"; and it "makes government more responsive by putting the States in competition for a mobile citizenry." *Ariz. State Legis.*, 576 U.S. at 817 (quotation omitted).

At present, the States are devising solutions to modern security threats, such as doxing. They employ various approaches to protecting the personal information of their public servants and/or election officials. *See, e.g.*, Ariz. Stat. Rev. Ann. §11-483; Cal. Gov. Code §6254.21; Col. Rev. Stat. §18-9-313.5; 705 Ill. Comp. Stat. §§90/1-1, 2-5, 3-1; Nev. Rev. Stat. §293.908; Ohio Rev. Code §149.43(A)(1)(p); Okla. Stat. §21-1176; Or. Rev. Stat. §247.965; Tex. Gov. Code §552.117; Wash. Rev. Code §4.24.680. Which approach works best remains an open question. And many have called on the States to do even more in this field. *See Intimidation of State and Local Officeholders* at 22.

Congress has also entered the mix. A few years ago, it enacted the Daniel Anderl Judicial Security and Privacy Act. Pub. L. No. 117-263, §5931. That Act makes it generally unlawful for business or individuals to publicly post on the internet the personal information of federal judges and their families. *See id.* at §§5933, 5934(d). State officials across the ideological spectrum overwhelmingly supported Congress's efforts. *See* Letter from State Attorneys General to Lindsey Graham, et al. (Dec. 14, 2020), https://perma.cc/2ST9-QZA2 (letter of support signed by the Attorneys General of 46 States, the District of Columbia, and multiple territories). But, as Judge Salas has observed, there is still work to be done. For example, the federal version of Daniel's Law "doesn't cover the 30,000 state and local judges that also

put their lives on the line to serve the public." Ryckman, *States and Congress Act to Protect Judicial and Election Workers.*

Strict scrutiny would seriously limit the States from acting as the founders who designed the Constitution understood they would—as laboratories of democracy. Under that "demanding standard," a law survives only if it is narrowly drawn to serve a compelling government interest. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). Challengers may simultaneously criticize a law for being overinclusive (doing too much) and underinclusive (doing too little). *Id.* at 802, 804. That standard necessarily interferes with state experimentation, as it assumes that judges can discern a "least restrictive means" of achieving the state interests at stake. *See McCullen v. Coakley*, 573 U.S. 464, 478 (2014). In practice, "strict scrutiny readily, and almost always, results in invalidation." *Vieth v. Jubelirer*, 541 U.S. 267, 294 (2004) (plurality op.). Thus, under a strict-scrutiny approach, any law restricting the publication of personal identification information—including the federal version of Daniel's Law—would presumably be in jeopardy.

One final point about technology. It "would be foolish to" think that technology has no effect on constitutional analysis. *Kyllo v. United States*, 533 U.S. 27, 33–34 (2001). Even so, the Supreme Court has recognized that there are "limits" to how much technology may "shrink" constitutional expectations. *Id.* at 34. It follows that

there must be some limit to how much technology may shrink the constitutional expectation that the government will be able to effectively protect its public servants. *See In re Neagle*, 135 U.S. at 59, 64. On a more practical level, the Supreme Court has stressed the need to "tread carefully" in areas of technological development so as to "not 'embarrass the future.'" *Carpenter v. United States*, 585 U.S. 296, 316 (2018) (quoting *Northwest Airlines, Inc. v. Minnesota*, 322 U. S. 292, 300 (1944)). Whereas here, by calling for strict scrutiny, the defendants ask this Court to take a much less cautious approach. That is a sure sign they are wrong.

## CONCLUSION

The Court should affirm.

DAVE YOST
Ohio Attorney General

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER*
Ohio Solicitor General
 *Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 E. Broad St., 17th Fl.
Columbus, Ohio 43215
614.466.8980
thomas.gaiser@ohioago.gov

*Counsel for Amicus Curiae*
*State of Ohio*

## ADDITIONAL COUNSEL

STEVE MARSHALL
Alabama Attorney General

TREG R. TAYLOR
Alaska Attorney General

TIM GRIFFIN
Arkansas Attorney General

ROB BONTA
California Attorney General

PHILIP J. WEISER
Colorado Attorney General

WILLIAM TONG
Connecticut Attorney General

KATHLEEN JENNINGS
Delaware Attorney General

BRIAN L. SCHWALB
District of Columbia Attorney General

JAMES UTHMEIER
Florida Attorney General

CHRISTOPHER M. CARR
Georgia Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

KWAME RAOUL
Illinois Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

KRIS KOBACH
Kansas Attorney General

RUSSELL COLEMAN
Kentucky Attorney General

LIZ MURRILL
Louisiana Attorney General

ANTHONY G. BROWN
Maryland Attorney General

ANDREA JOY CAMPBELL
Massachusetts Attorney General

DANA NESSEL
Michigan Attorney General

KEITH ELLISON
Minnesota Attorney General

LYNN FITCH
Mississippi Attorney General

ANDREW BAILEY
Missouri Attorney General

AUSTIN KNUDSEN
Montana Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

AARON D. FORD
Nevada Attorney General

JOHN M. FORMELLA
New Hampshire Attorney General

RAÚL TORREZ
New Mexico Attorney General

LETITIA JAMES
New York Attorney General

JEFF JACKSON
North Carolina Attorney General

DREW H. WRIGLEY
North Dakota Attorney General

GENTNER DRUMMOND
Oklahoma Attorney General

DAVID W. SUNDAY, JR.
Pennsylvania Attorney General

ALAN WILSON
South Carolina Attorney General

MARTY JACKLEY
South Dakota Attorney General

JONATHAN SKRMETTI
Tennessee Attorney General
and Reporter

KEN PAXTON
Texas Attorney General

DEREK E. BROWN
Utah Attorney General

CHARITY R. CLARK
Vermont Attorney General

JASON MIYARES
Virginia Attorney General

BRIDGET HILL
Wyoming Attorney General

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume for an *amicus* brief supporting an appellant and contains 4,514 words.  *See* Fed. R. App. P. 32(a)(7)(B)(i), 29(a)(5).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General

## CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEF

I hereby certify that the electronic version of this brief is identical to the text version in the paper copies that are being dispatched by overnight delivery to the Clerk of the Court of the United States Court of Appeals for the Third Circuit.

*/s/  T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General

## CERTIFICATE OF VIRUS SCAN

I hereby certify that this document was scanned using CrowdStrike Falcon Sensor, version 7.24.19607, and Microsoft Defender 365 and no viruses were detected.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General

## CERTIFICATE OF COUNSEL

I hereby certify that I am a member of the bar of this Court.

_/s/ T. Elliot Gaiser_
T. ELLIOT GAISER
Ohio Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2025, the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General
